Fremont-Smith, Thayer, J.
After Commerce Insurance Company (“Commerce”) disclaimed coverage under plaintiffs automobile policy for plaintiffs loss resulting from the theft of her automobile, plaintiff brought suit and the case was tried to a jury, which returned a verdict for the plaintiff in the sum of $24,725, which was the stolen car’s stipulated cash value. The Court reserved to itself plaintiffs G.L.c. 93A claim, and took additional evidence following the trial. The Court’s findings, rulings and judgment are as follows.
Ann Gentile purchased a 2000 Infiniti on December 6, 1999 and registered it in her name. The purchase was financed with a loan to Ann of $25,025 from Chase Automotive Finance, which Ann’s grandson, Christopher Gentile, co-signed.
Ann purchased an automobile insurance policy through Commerce. Her application for Massachusetts Motor Vehicle Insurance listed her as a 75% user and Christopher as a 25% user.
The plaintiffs car was stolen on October 19, 2000. Christopher contacted the Boston Police that evening. The Infiniti was subsequently located and declared a total loss with an actual cash value of $24,725. There is no contention that the plaintiff or her family was involved in the theft.
On October 19, 2000, Ann sent Commerce an Affidavit of Vehicle Theft. The filled-out affidavit of Vehicle Theft advised Commerce that there was an auto loan from Chase Auto. Finance, Acct. #19933616021409, with abalance due of $21,450.42 and a monthly payment of $500.78.
On December 29, 2000, a Commerce insurance adjuster, Anne Dunphy, wrote to Ann notifying her that the claim had been denied. The letter quoted from the Massachusetts Automobile Policy provision regarding false, deceptive or misleading information (policy, p. 28, para. 18), and asserted that, by listing herself as a 75% operator and Christopher as a 25% operator of the vehicle, Ann had violated that policy provision. The letter made no reference to payment of the auto loan which had been described in detail in the affidavit, or to the provision of the Massachusetts Automobile Policy relating to payment of an outstanding automobile loan (policy, p. 27, para. 13), but simply concluded generally that Commerce would refuse to indemnify for loss of the vehicle or for any related expenses.
Both Christopher and Patricia (his mother) then telephoned Commerce and discussed with Dunphy and another representative, in two separate calls, their need for payment in light of the outstanding loan debt, but were simply told that the claim was denied.[1] No Commerce representative advised either of them that, for Commerce to pay off an auto loan, Commerce *469 required that there be a direct request from the lendorfinance company. Had Christopher or Patricia been so notified, they would have told the lendor to make the required direct request.[2]
On January 8, 2001, an attorney for the plaintiff sent, by certified mail, a G.L.c. 93A and G.L.c. 176D demand letter to Anne Dunphy of Commerce. The letter disputed Commerce’s position that Christopher was the primary operator, pointed out the undisputed destruction of Ann’s $35,000 automobile, and reiterated that there was a current loan obligation of $21,000 on the car. The letter asserted violations of G.L.c. 176D, §3(9), subparts a, b, d, e, f and n, and demanded as damages payment of the loss arising out of the fair market value of the automobile, the cost of substitute transportation, increased interest accruing on her car loan, and storage and towing costs.
On January 22, 2001, Dunphy responded. Her letter denied that Commerce had engaged in unfair and deceptive practices by its failure to pay plaintiffs claim. It discussed Commerce’s investigation concerning Christopher’s use of the auto, and went on to state:
Our investigation revealed that your client provided false, misleading and incomplete information. We are exercising our right to deny this claim based on this information. We have the right to exercise this option as the coverage used is an optional coverage. Our risk of loss is increased with Christopher Gentile being the primary operator of the vehicle.
The letter said nothing about the outstanding car loan or the policy’s coverage thereof, or the company’s undisclosed policy requiring a direct request from the lien holder for payment.
Plaintiff filed suit against Commerce on January 7, 2004. The Complaint alleged:
(1) On the day of the theft, the Infiniti had a value of $35,000 and a remaining amount of $21,000 due on the loan incurred to purchase the automobile (paragraph 16);
(2) As a result of the refusal of Commerce Insurance to provide coverage, Ann Gentile has had to continue to make payments on the automobile loan which she incurred to purchase the Infiniti and she had to pay storage costs for the automobile (paragraph 24);
(3) The actions of Commerce Insurance Agency constitute an “unfair claims settlement practice” declared unlawful by G.L.c. 176D, §3, as they constitute:
a. refusal to pay claims without conducting a reasonable investigation, based upon available information;
b. failure to effectuate prompt, fair, and equitable settlement of claims in which liability has become reasonably clear; and
c. failure to provide promptly a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim for the offer of a compromise settlement. See G.L.c. 176D, §§3(9)(d) and (n).
(Complaint para. 25).
The c. 93A-c. 176D demand letter dated January 8,2001, which also had referenced the $21,000 outstanding loan balance on the car as a circumstance bearing on the violation, was annexed to the complaint as exhibit A.
The jury specifically found that there was no false statement in the application for insurance and rendered judgment for the plaintiff in the sum of $24,725, the stipulated value of the car. There remain two issues for the Court:
1. Did Commerce violate G.L.c. 93A and G.L.c. 176D, §3 by its refusal to provide coverage under the policy for plaintiffs loss resulting from the theft of the car?
2. Did Commerce violate G.L.c. 93A and G.L.c. 176D, §3 by its failure to pay off the lien holder or at least to inform plaintiff of Commerce’s in-house, undisclosed practice not to do so unless or until a demand for payment had been received by Commerce directly from the lien holder?

I. Plaintiffs Loss Resulting from the Theft of the Automobile

Commerce denied coverage on the basis of page 28, para. 18 of the Standard Massachusetts Automobile Policy, which provides:
If you or someone on your behalf gives us false, deceptive, misleading or incomplete information in any application or policy change request and if such false, deceptive, misleading or incomplete information increases our risk of loss, we may refuse to pay claims under any or all of the Optional Insurance Parts of their policy. Such information includes the description and the place of garaging of the vehicles to be insured, the names of all household members and customary operators required to be listed and the answers given for all listed operators.
As noted above, Commerce’s position in denying coverage was that Christopher was falsely listed on the insurance application as a 25% user and Ann as a 75% user, and that this falsehood increased Commerce’s “risk of loss” because Christopher was a more than 50% operator, which, with Christopher’s driving record, would have increased the annual premium of $3,356, by $ 1,613. As also noted above, after trial, the juiy returned a verdict for the plaintiff for $24,725 (the stipulated cash value) and answered “no” to the special juiy question: “Was the statement in the application for auto insurance, that Christopher Gentile was only an occasional (25%) operator of the vehicle, untrue?”
Although the juiy found that Commerce wrongfully denied coverage for the loss from the theft because Christopher was only a 25% operator, it is well settled that an insurer’s good faith, plausible and reasoned legal position, although ultimately shown to have been mistaken, is beyond the scope of the punitive aspects *470 of the combined application of Chapters 93A and 176D. Guilty v. Commerce Insurance Company, 36 Mass.App.Ct. 339 (1994) (explaining that an insurer’s duty is met where an insurer has kept the insured informed, has investigated with reasonable efficiency and thoroughness, and has acted in good faith).
The first question, then, is whether Commerce conducted a conscientious investigation of the claim, and, based thereon, had a good faith belief that Christopher was a more than 50% operator when the application for insurance was made and it disclaimed coverage.
After sending Ann a letter on October 24, 2000 that Commerce was undertaking an investigation and reserving its rights, Commerce assigned an investigator, Kent Vertucci, to investigate whether Christopher was the primary operator. Vertucci interviewed Christopher and Ann. Christopher told Vertucci that he customarily used the car to go to work at Grille 23 Restaurant in Boston, and that his grandmother, Ann, and mother, Patricia would use the automobile to visit Ann’s brothers, who lived in South Boston, and that he and Ann, both made payments on the vehicle. Ann told Vertucci that she and Patricia would use the Infiniti to go to see her brothers in South Boston and to take Ann to the doctor.
After setting forth the above facts and others learned by him in his report (including Christopher’s use of the car to drive to work and his parking and moving violations with the car) Vertucci’s report concluded “it is this investigator’s opinion that Chris and Pat share this vehicle approx. 50% each. I. have no evidence to support that one drives the vehicle more than the other.” (Emphasis added.)
Dunphy testified that, in addition to the report, Commerce based its conclusion that Christopher had been and was the primary operator, on the twenty parking violations Christopher had on the car, five moving violations, and a call from a BMW dealer who inquired about a settlement, as Christopher was seeking to purchase a new car.
As for the parking violations, Christopher told the investigator that almost all of them were received near his workplace[3] (Grille 23, 161 Berkeley Street, Boston), as he customarily parked the car on the street instead of in a garage. He explained at the trial that he did this because a parking ticket would cost less than it would cost for a garage. Accordingly, the parking tickets reveal nothing about his use of the car other than his admitted use of it to commute to work.
As for the five moving violations, nothing can be inferred therefrom other than his admitted occasional use of the car. He testified, moreover, that three of the violations involved a single incident.
The telephone inquiry from the BMW dealer indicates that Christopher needed the use of a replacement car, but proves nothing about what had been his percentage of use of the Infiniti.
Although the investigator found that the car had between 18,000 - 22,000 miles on it, neither he nor anyone else at Commerce made any analysis as to the total number of miles which would have been accounted for by Christopher’s driving the car to and from work, or as to Ann’s[4] or Patricia’s use of the car. Christopher lives about 16 miles from Grille 23; so that even if he had commuted there five days a week for the entire year, this would have accounted for only about 8,192 miles of the 18,000-22,000 miles on the car. He testified, moreover, that he did not work 5 days every week, and had not worked every week of the year. Although Christopher had made a down payment on the purchase of the Infiniti ($4,000), Ann signed as the “buyer” for the car loan (Christopher signing “as co-buyer”). Patricia testified it was she, rather than Ann or Christopher who made most of the loan payments.
Based on all of the above, the Court concludes that Commerce failed to conduct a thorough investigation as to Christopher’s percentage of use of the car. It denied coverage, moreover, in contradiction to the conclusion of its own investigator, that Christopher was not shown to have been a more than 50% operator of the car. Although Commerce may have had reason, as the investigator put it in his report, to “suspect” that Christopher might have been the principal operator, it had, as the investigator flatly concluded, “no evidence to support that [Christopher] drives the vehicle more than [Pat]." (Emphasis supplied.)
Accordingly, although the Court finds that Commerce’s denial of coverage for the car theft was based upon what might be called a hope and a prayer, it was not based upon factual evidence, so cannot be said to have been in good faith for purposes of c. 176D, §3. Accordingly, Commerce’s disclaimer of coverage was a violation of G.L.c. 93A and G.L.c. 176D.

II. The Secured Lender Provision

The policy also provided that, in the event of a theft, Commerce would make payments which were or would become due to any secured lender. At the time of loss, $21,450.42 was owed to Chase Auto Finance, as specified in plaintiffs Affidavit of Vehicle Theft.
The policy (p. 27, para 13) with respect to “Secured Lenders” provides:
When your coverage Selections Page shows that a lender has a secured interest in your auto, we will make payments under Collision, Limited Collision and Comprehensive (Parts 7, 8 and 9) according to the legal interests of each party.
The secured lender’s right of payment will not be invalidated by your acts or neglect except that we will not pay if the loss of or damage to your auto is the result of conversion, embezzlement, or secretion by you or any household member. Also, we will not pay the secured lender if the loss of or damage to your auto is the result of arson, theft or any other means of disposal committed by you or at your direction.
*471 When we pay any secured lender we shall, to the extent of our payment have the right to exercise any of the secured lender’s legal rights of recovery. If you do not file a proof of loss as provided in this policy, the secured lender must do so within 30 days after the loss or damage becomes known to the secured lender.
Although there was no contention that plaintiff or her family were involved in any way in the theft, Commerce disclaimed any and all coverage under the policy, and in the face of a number of notifications about the automobile loan discussed above, maintained a complete silence about plaintiffs’ secured lien coverage and about Commerce’s unannounced policy that it would only provide “secured lenders” coverage when and if the lien holder itself made a claim for payment under the policy.[5] Commerce did this even though plaintiff or her family notified Commerce of the secured loan (1) in the policy application, (2) in the Affidavit of Vehicle Theft, (3) in at least two telephone conversations with Commerce, (4) in the January 8, 2004 G.L.c. 93A - G.L.c. 176D letter, and (5) in the complaint, which also annexed the January 8 demand letter as exhibit A.
As stated in 35 Mass. Practice Series, §4.31, pp. 300-01: “Nondisclosure of material facts is one type of conduct found to be unfair or deceptive . .. The Massachusetts appellate courts have held that the failure to disclose material information to a consumer constitutes deception in violation of the Consumer Protection Act,” citing numerous Massachusetts decisions.
See, for instance, Green v. Blue Cross & Blue Shield of Massachusetts, 47 Mass.App.Ct. 443, (1999), where the Court said (at 447-48), that c. 93A, “which applies to the insurance industry even in areas in which it overlaps with c. 176D . . . was a legislative attempt to regulate business activities with a view to providing proper disclosure of information and a more equitable balance in the relationship of consumers to persons conducting business activities.” There the Court held that defendant insurer’s failure to advise the plaintiff, in the course of its settlement discussions with the insured, of defendant’s non-public pricing policies regarding its coverage for surgical procedures, constituted a violation of c. 176D, even though the plaintiff had never specifically inquired about defendant’s pricing policy for the surgical procedures in question. Id., 447.
As for the materiality of the non-disclosure, Christopher testified that, had he been told of this surreptitious policy, he would have requested Chase Auto Finance to demand pay-off of the loan for the benefit of plaintiff and his family.[6]
Defendant next contends that, even were there a duty to disclose its lien holder coverage and its secret policy with respect to the prerequisites for its payment of that coverage under these circumstances, it cannot be held responsible for its refusal to provide coverage of the auto loan, because neither the complaint nor the 93A demand letters sufficiently specified Commerce’s conduct in that regard to have been a violation of c. 93A and c. 176D.
But, as outlined above, Commerce was informed over and over again, in writing and telephone conversation, about the outstanding secured loan, even to the extent of being told, in the Affidavit of Theft, the lien holder’s name, the account number, the outstanding balance of the loan, and the monthly payment. Both the complaint and the appended c. 93A demand letter specifically complained about defendant’s disclaimer of coverage in light of the outstanding loan balance. In these circumstances, the Court rules that the complaint and the incoiporated c. 93A demand letter, gave Commerce adequate “notice pleading” in that regard.
In this regard, the Court in RGI Associates v. Stainsafe, 33 F.Sup.2d 215 (D.Mass. 2004), said with respect to the particular claim asserted there (at 232):
Stainsafe’s argument that it had no notice of this aspect of the chapter 93A claim is without a basis in law or in fact. In sharp contrast to the circumstances in [Halper v. Demeter, 34 Mass.App.Ct. 299 (1993)], the chapter 93A count in the amended complaint contains no limiting language confining the claim to anything more than the broad, boiler plate language that Stainsafe committed unfair and deceptive acts or practices.
As noted above, the complaint in this case alleged, inter alia, that, “at the time of the theft, the 2000 Infiniti J30 had a value of $35,000 and a remaining amount of $21,000 due on the loan incurred to purchase the vehicle (complaint, para 15), and that, ‘as a result of the refusal to Commerce Insurance to provide coverage, Ann Gentile has had to continue making payments on the automobile loan . . .” (Para. 24). The complaint goes on to allege, “without limiting language” or “confining the claim to anything more than broad, boilerplate language,” as in RGI, supra, that Commerce “committed unfair and deceptive acts or practices.” Complaint, para. 25.
As for the adequacy of the demand letter, in Cohen v. Liberty Mutual Insurance Co., 41 Mass.App.Ct. 748 (1996), the court said (at 756):
Liberty also contends that the trial judge erred in holding it liable under G.L.c. 176D, §3(9)(f), because the plaintiffs c. 93A demand letter did not specifically allege that Liberty violated subsection (f). We do not read c. 93A to require this degree or kind of specificity. Piccuirro v. Gaitenby, 20 Mass.App.Ct. 286, 292 (1985) (concluding that a demand letter generally alleging a violation of c. 93A was sufficient where the letter described the underlying facts with reasonable specificity).
It is also to be noted that, by keeping plaintiff and her family “in the dark” about the secured lender coverage and defendant’s secret payment policy in regard thereto, plaintiff and her family would have had to have been *472 clairvoyant to make more specific “secured lender” allegations in the complaint and demand letter.
Even if it could be said that plaintiff should have been more aware of the policy’s secured loan coverage and should have made more pointed inquiry and demand in that regard, the policy itself states, at p. 27, para. 13, that “the secured lender’s right of payment will not be invalidated by your acts and neglect. . .” Nor has any case been cited to the effect that a plaintiffs contributory negligence should constitute a defense to recovery under c. 93A. It is well settled that a plaintiffs contributory negligence is not a bar to a defendant’s wilful, wanton or reckless conduct. Potter v. Gilmore, 282 Mass. 49 (1933); Baines v. Collins, 310 Mass. 523, 526 (1942). The commission of an unfair or deceptive act under c. 93A and c. 176D is analogous.
Were Commerce’s violations of c. 93A and 176D “wilful or deliberate” so as to warrant punitive damages?
With respect to the denial of coverage for the car theft, while Commerce had no evidence to justify its refusal of coverage, at least it did have some facts which led, as the investigator concluded, to a “suspicion.” The Court views Dunphy as having been a generally candid and honest witness, and does not view defendant’s refusal of coverage for the theft loss to have been egregious enough[7] to have constituted a “wilful and deliberate” violation of c. 93A.
The Court, however, views what was indicated to be Commerce’s company-wide policy not to volunteer anything in settlement negotiations about the “secured lender” coverage of an insured or the company’s policy concerning the prerequisites for its payment thereof, to be “wilful and deliberate,” and to have been an egregious violation of c. 93A and c. 176D.

JUDGMENT

Accordingly, the Court awards under c. 93A and c. 176D as damages resulting from Commerce’s denial of coverage for the car theft, the amount of lost interest on the withheld insurance proceeds[8] from the date of the Affidavit of Loss (October 19, 2000) to the date of the juxy award (August 22, 2006) which is the sum of $17,346.79,[9] plus attorney fees and costs.[10]
As for the c. 93A violation regarding the “secured loan,” the Court awards treble the amount of the outstanding auto loan (which was $17,979.07),[11] in the total amount of $53,937.23. Thus, the total amount of damages awarded to the plaintiff under c. 93A and c. 176D (before an award of costs and attorney fees) is as follows:
93A - award for interest on withheld theft coverage $17,346.79
93A - award for non-coverage of secured loan ($17,979.07)
Trebled 653.937.21
Total $71,284.00
Less[12] $17,979.07
Total Award under c. 93A and c. 176D $53,304.93

The policy provision concerning Commerce’s obligation to pay off a lien holder (policy, p. 27, para. 13) appears to be independent of the “false information” provision (p. 28, para. 18) in that it provides that the “secured lender’s right of payment will not be invalidated by [the insured’s] acts or neglect except... if the loss of or damage to your auto is the result of arson, theft or any other means of disposal committed by you or at your direction.”

Indeed, the relevant provision of the insurance policy (p. 27, para. 13), states that “if you do not file a proof of loss as provided in this policy, the secured lender must do so within 30 days after the loss or damage becomes known to the secured lender.” This provision would be reasonably understood by an insured to indicate that, where a proof of loss was filed (as plaintiff did here) no demand to or by the secured lender would be necessary.

This is borne out by the tickets, which were placed in evidence.

Trial testimony indicated Ann’s use of the car declined precipitously after the date of the loan application, due to her declining health, and no investigation was done of her percentage on the car’s use up until the time of the insurance application, which would bear on whether the information in the application was false at the time.

In fact, as noted at p. 3, in. 2, above, the above-quoted p. 27, para. 13 of the policy requires a demand by the secured lender only “if you do not file a proof of loss," which the plaintiff had done by way of the Affidavit of Theft, which specified the amount of loan balance, the loan account number, and the name of the secured lender. The inference which an insured would reasonably draw from the policy language is that no claim by the secured lender was required under these circumstances, which is the opposite of the surreptitious company policy to the contraiy.

The Court views defendant’s assertion that plaintiffs family lacks standing to make a claim under the policy’s secured lender provision because only the finance company is the intended beneficiary thereof, as frivolous.

As stated in 35 Mass. Practice Series, Consumer Fraud, ¶4.64, with respect to punitive damages under c. 93A, “neither the statute nor the decided cases furnish clear guidance beyond the judge considering the egregiousness of the defendant’s conduct.”

See 35 Mass. Practice Series, Consumer Law 4.59, p. 348. Where no bad faith is found, so that only single damages are to be awarded, the damages separate from the jury verdict on the c. 93A violation for withheld insurance proceeds is the lost interest on the withheld proceeds. Id.

“Chapter 231 section 6C provides a prejudgment interest rate of twelve percent per annum in actions based on contractual obligations. G.L.c. 231, §6C (1994). This court finds that this is a fair rate of interest for the purposes of calculating damages under Chapter 93A.” Dunkin Donuts of Mass. Inc. v. Bell (Mass. Superior Court, No. 94-00298, June 21, 1996, unpublished) (5 Mass. L. Rptr. 346). The value of the stolen car (awarded by the jury) was $24,725. Interest at 12% on this withheld amount, from October 19, 2000 to August 22, 2006 (2,134 days) comes to $17,346.79.

 °To be awarded on proper motion supported by appropriate affidavits and documents and to be filed accordingly to Rule 9A procedure within 21 days after the docketing of this decision.

The loan balance paid by plaintiff to Chase Auto Finance had been reduced by $4,000for reasons unexplained to the Court.

To avoid duplication of recovery as a result of the jury award for breach of contract which encompassed, to that extent, the same damages. See 35 Massachusetts Practice, Consumer Law, §4:64, p. 358.